Good morning, your honors. My name is Stephen Frankel, and I am of counsel to Keith Barnett, who is the attorney of record, who appeared at the trial below and in the earlier proceedings. Obviously, the first question is the one of jurisdiction. Did the court below in the BIA erroneously conclude that the appellant failed to demonstrate his asylum filing was within reasonable time of his proffer change? And I would point out that there are two events in his life that triggered the reason that the filing was in July of that year, 2014. First, he had no religion in his life in China. His family followed no religion, never went to services. They had no when he came to the United States. Then he was approached in December of 2013 by missionaries from the Church of Jesus Christ of Latter-day Saints, and they preached to him the gospel. They convinced him to come to services, meet with their parishioners, and to see that he could better his life. He said the dramatic change for him was he stopped smoking, he stopped drinking, he ate healthy, he exercised. And I would point out, Your Honors, that the timing of this is significant and was not considered by the court or the BIA below. He didn't immediately run to a lawyer and say, I just found Jesus and I want to apply for asylum. He joined the church, and in January of 2014, he was baptized and became an active member of the church, participating in all their functions and attending services. Again, he didn't go to an attorney because at that point, he had no reason to believe he couldn't return to China. But an asylum application has to be filed within one year, or your client had the burden of proving the exception applies here. The IJ found your client to be not credible with regard to the principal claim. So maybe we should address the adverse credibility finding. Okay, if we can. Your Honor, the two things that the court pointed to as they believe was most important. The first one was he didn't know who the president of the church was. I believe it's a 99-year-old man. The church has millions of members all over the United States, all over the world. This man had nothing to do with the petitioner, with his church, with the people in his church, and he never met him, never spoke with him. And significantly, the president, as a titular head, was not a preacher, didn't preach to my client or his people because he didn't speak Mandarin or Cantonese. There are certainly occasions in which not knowing a given fact about either religious doctrine or how your church operates wouldn't be enough to get a verdict. But there was never a question of doctrine. The only issue that they raised below was you didn't know who the new president was, but he knew who the president had been for the five years he was a member. But that raised questions about whether he was continuing to be a member of this. And in any event, that wasn't the end of the IJ's analysis. Then he looked to see whether there was corroboration for your client's claims and found a number of deficiencies. What is the error here that you're urging us to find? Well, the first part of the jurisdiction and the timing, but that the court below and the BIA emphasized first that he didn't know the name of the, excuse me, the president being highly significant. You could ask the people who vote all through New York or consider themselves politically active, who's the head of the Democratic Party? Who's the head of the Republican Party? Who's the head of the Independent Party? Ninety percent of the people who consider themselves enlightened and active couldn't give you those things. Perhaps I wasn't clear, but that's not the end of the credibility determination. The IJ then considered whether there was corroboration, which would have removed the doubt created by his not knowing the titular head of the Latter-day Saints. And as I said, he was concerned that there was no evidence from the local bishop that the printout about his baptism had misinformation in it, that he hadn't sent information by his mother about the Chinese summons, even though she provided other information. I mean, there's a list of things that the IJ identified as problematic here. So, looked at together, how would we identify error here? Well, Judge, with regard to his mother in those circumstances, had she submitted an affidavit, woman's illiterate, doesn't read, doesn't write, doesn't speak English, it would have been from someone else. At this point for the court below to say, well, that's a real problem. There should have been one of those. Is there any way that wouldn't have been considered one? Would have just been incredible. Who else wrote it? What did they say? And in fact, did the mother write that? Now, is there any doubt that if this man was a fraud, he could have gotten an affidavit and someone could have signed it, said it was his mother and someone could. He didn't do that. I think that that's important. The court looked at it one way. I think it should be looked at the other way. Would have been very easy to slip documents in that were not relevant, documents in that the court might have wanted. And if the court had relied on that in his mother's circumstances, it would have made no sense at all. So respectfully, I believe that these are the kinds of things. It took six months for him. How about the absence of any letter from the bishops who had introduced him to the faith? And also he'd taken English classes from them for an extended period, but they didn't submit a letter or otherwise. It certainly would have been better, but they knew the names of the people that he could have been told. You've got to now bring in those. There were six people, two elders, Elder Wu, Elder Bai, two bishops, the people that he relied on. And at no point did the court say bring them in. Maybe he should have done it on his own, but this is something that after the fact could have been done and they're the people that did count, not the president of the church out in Salt Lake City or wherever he might be. Any further questions? I'm sorry. If substantial other evidence could support the credibility determination or the no credibility determination, but we conclude that the court, the IJ relied to a significant degree on an improper factor. What's the legal framework for evaluating that? Well, that was the lack of the mother's affidavit. I'm asking just the legal framework. Is the legal framework that we ask whether substantial other evidence could support the conclusion even without the improper finding, or do we ask whether the improper finding likely enough affected the reasoning that it needs to go back for a re-announcement? Well, if this court would consider sending it back for him to obtain those documents, understanding the significance of it, I believe the documents from all he's still in the church, still dealing with these people, they're his mentors, and be a very simple thing on paper. It wouldn't take much time and effort at this point, but I explained to him what the court's concern is, understandably. Thank you. Good morning, Your Honor. Eric Anderson representing the Attorney General in the case before the court today. Mr. Wong seeks asylum because he says he converted to the Mormon church in the United States, practices the religion here, and he intends to practice in China in a way that would expose him to risk. However, at this hearing, when he was subject to questioning, there were doubts that arose about his credibility. And then when the immigration judge began to look at the corroboration that was or was not provided, he saw Mr. Wong provide a series of rapidly changing explanations of why there was certain evidence he did not provide. The immigration judge was in the best position to evaluate the credibility. The record doesn't the contrary conclusion, and we'd ask the petition to review to be denied. To start with the issue of the president of the Mormon church, when the immigration judge inquired about this, there was initially some understandable confusion. He provided the name of his bishop, and then the immigration judge clarified, no, no, no, I'm sorry, I mean the president of the entire Church of Jesus Christ of Latter-day Saints. And without hesitation, at least no hesitation recorded in the record, he said Thomas Monson. Now we know, and the knowledge here, which is in terms of the evidence in the cases, what did Mr. Wong's counsel agree to at the time? Because there's no documents about the history of the presidency in this record. But Mr. Wong's counsel agreed Mr. Monson had been not president because he had been dead for 18 months. But he was president at the time that this gentleman was baptized. That's correct. As he later explained. That's right, Your Honor. In 2013-2014, Mr. Monson was president at the time. So the problem here is not that he wasn't familiar with the church hierarchy, it's that his knowledge was out of date. He didn't keep up on the change in the presidency. And that in two ways. The first, yes, he was allegedly, he said, attending church approximately once every two weeks, but did not know this. And then when he was asked, there might be a very good explanation why he might not know about this change. But instead he said, well, actually, I just didn't pay attention to it. I stopped paying attention to it at some point. Well, you know, two minutes before he had answered without hesitation Thomas Monson, if he didn't, if the role of the presidency of the Mormon church in his practice of his religion didn't matter, he could have said that initially, but he answered without hesitation. And only after the error was exposed, did he resort to saying, well, actually, I didn't care. I'm trying to understand this. I mean, let's assume the assumption that there wasn't, I don't know how a transcript is going to tell us whether there was hesitation, but let's, assume you're right, that he answered with confidence, but his answer was wrong. If he'd come up with a name that was sort of from left field, I could understand your point, but what I'm puzzled by is he was right. That was the former president of the time that he was baptized. And the omission here is his failure to be knowledgeable about changes in the church hierarchy in Salt Lake since his baptism. Am I right? Am I right in understanding that's what the credibility staining failure was here? That's right, Your Honor. He was asked, who is the current president? He provided an incorrect answer. And then his unable to explain why, you know, I don't follow. I mean, what should he have said at that point, having gotten it wrong? What's the right explanation? Well, I wish he had provided perhaps one that did make sense, Your Honor. I don't know. The fact is, if his answer is consistent with someone who had attended church five years in the past, four or five years in the past, and then stopped attending, stopped practicing. I'm sorry, Your Honor. I think we'll have to take another recess. Oh, the court will stand in recess and we'll reconvene when we get more news. Court's in recess. I will do my best picking up where we were, Your Honor. And at that point, I would say of course, this entire decision does not turn on the issue of the president of the Mormon church, but that was what began the inquiry into other areas where things were missing. But I appreciate you leading with that because that leads to the sort of standard question that I was asking your colleague, which is, let's assume for a minute that a factor that the court considered, maybe even a significant factor that the court considered is improper. And let's assume that we may find enough other things in the IJ's decision that could have independently supported a credibility determination. Is the framework that we're to apply that we ask ourselves whether the improper factor likely had a significant enough influence that it's called into question, or do we just backfill with the remaining? I think it's ultimately, it has to be a matter of affirming the agency's decision. And I think the standard this court invokes is if you're confident the agency is going to reach the same conclusion, you'll affirm and will not remand. Let me pursue with you for a moment, the possibility of this being an impermissible question. I gather from your brief, you don't concede that, right? That's correct. All right. And we have suggested or held that questions about the doctrines of the faith should not inform a judgment, I would assume in large part, because the court does not decide what a church can or cannot make part of its doctrine. Is that a fair assessment? Well, in terms of the rationale of why this court has that rule, I'd leave it up to you. And I gather you don't think that knowing the administrative persons in the church falls within the category of doctrine. It's more, well, not quite, but akin to knowing the address or something else that's not doctrinal. It's simply a matter of who's holding the position at a given time. Leadership, Your Honor. Okay. And am I also right in understanding that your attending church regularly? This is something he would be expected to know. Yes, or... The papers analogize it to, would a regularly practicing Catholic know when the Pope changed? I mean, one can debate that, but that's the analogy you've drawn, right? Yes, Your Honor. It's something he would be expected to know, or he could offer an explanation why he might not know. And that all goes to how credible is he that he has a fear that he as a practicing Mormon would be oppressed if he were returned to China? Yes, Your Honor. That's the continuum here that we're looking at. His practice here, he has not distinguished from the practice he intends to make. So now there's a question about whether or not he really is a regularly practicing Mormon based on that one question, and then that prompts all the other inquiries. Yes, Your Honor. Okay. Can you tell me the analogy to the Pope? And I'm sorry, is that, is that, did that come from the testimony? That was the immigration judge's question to him. And the question was, is the President sort of like the Pope? That's right, Your Honor. And he might very well have said, Your Honor, as a Mormon, I don't know what to compare the Pope to. But he didn't. He simply agreed with the comparison. He said, correct. But yes, the words came from the immigration judge, and Mr. Wong agreed with them. So let's look to the rapidly changing explanations about the, there was no evidence from the bishop and the missionaries who had converted him to the faith. His initial explanation was, I don't have them because they moved back to their hometown. Well, actually, that's not a very persuasive reason. And the immigration judge observed, well, you have a letter allegedly from a friend in China. Why couldn't, if you could get that, why couldn't you get this? And then this led to explanation of, well, actually, my church has rules that you can't provide in-person testimony. Maybe you could provide telephonic testimony. Maybe you could provide written testimony. And then at the end of the day, his whole explanation is, well, why didn't you get a written statement from your bishop? I forgot. So this is a, the immigration judge is watching these changes occur in front of him. And then again, with the issue of the, why there is no statement from his mother about the delivery of this alleged summons? She's illiterate. Okay, well, why couldn't someone help her, such as your friend who lives in the same city as she does? Well, he was being watched. He couldn't come visit her. Well, actually, he came and gave his own letter to her, and she's the one who delivered it. So these explanations, they do not help his situation. They, in fact, show a more rapidly evolving, changing testimony. And again, the immigration judge is watching this occur before him. And unless the court has any other questions, I'm coming to the end of my time, and I'd ask the court to deny the petition for I won't take much of the court's time. In answer to your question, Your Honor, the president of the church is not like the Pope of the Catholic Church. He's an administrative person. The bishops and the hierarchy bishops are the ones who my client, the appellant, should know more about because they preach, and in his language, and it's all translated, and that's why he did give the name of seven people who are the people who he's counted on to translate for him, to introduce him to the parts of the church. Nothing that ever came from the first president, Manton, which counsel pointed out. Did he learn anything, or he just knew as then because when he was baptized, as in many places, you need to know some facts, and the fact is you need to know who the president of our church is, but he'd had no contact with them. He never saw me, never met with him, and he couldn't listen to his tape-recorded discussions with any of the parishioners because they were all in English. So he had his people doing those things, and I think, and this is the last thing, judges, it's the totality for things the court below did not disagree with or in any way say he wasn't responsive, or he was nervous and uncomfortable, or he was flapping about or doings. Nothing in his demeanor led the court to think that he was not being honest and candid and doing the best that he could. It was some of the instances where he took, number one, obviously the president of the church, and second, and I say relevance with an affidavit from a mother who's illiterate, speaks no English, and also is frightened because his friend, as is certainly in the record, was called in by the authorities. They picked him up and arrested him just to ask about my client, and is he coming back to China, and what is he teaching you, and show us, and he was very, he admitted he was very unhappy. He had to admit and confess to the authorities that his friend was sending him these things, teaching him these things. So the mother not jumping out and trying to be helpful, a woman who's, you know, again, very, very plain, simple woman in the countryside, is not going to want to be involved with the authorities right away, especially now that she knew there was a problem. Thank you, Your Honors. Thank you both, and we will take the matter under advisement.